UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY SMITH,

          Plaintiff,

    v.

ROSANA LIM-JAVATE, et al.,

          Defendants.

Case No. 16-cv-01278-SI

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 17

## INTRODUCTION

Anthony Smith filed this *pro se* prisoner's civil rights action under 42 U.S.C. § 1983. This action is now before the court for consideration of the motion for summary judgment filed by defendants and opposed by Smith. For the reasons discussed below, summary judgment will be granted in defendants' favor.

## BACKGROUND

The following facts are undisputed unless otherwise noted:

The events and omissions giving rise to this action occurred in the time period from June 2014 through March 2015, at the Correctional Training Facility (CTF) in Soledad, California. At the relevant time, Smith was a prisoner at CTF.

Defendants Darrin Bright, D.O., and Rosana Lim-Javate, M.D., were on the medical staff, and each served at times as the Chief Physician and Surgeon at CTF. Neither Dr. Bright nor Dr. Lim-Javate personally examined or treated Smith during the relevant time period. Instead, their alleged liability stems from the role of each in reviewing requests for services made by other

members of the medical staff, specifically, Dr. Lim-Javate's denial of a request in June 2014, and Dr. Bright's denial of two requests in early 2015. Docket No. 1 at 3. (For ease of reference, these challenged decisions will be identified in the statement of facts as "Decision # 1, "Decision # 2," and "Decision # 3.")

A.    Smith's Medical Care

Smith injured his shoulder at another prison in or about 2011 or 2012. Docket No. 1 at 3-4. He received cortisone injections and physical therapy for his shoulder. *Id.* at 4. After he arrived at CTF, Smith received cortisone injections for his shoulder in December 2013. *Id.*

In April 2014, Smith was examined by Dr. Friederichs, his primary care provider, whose examination revealed that Smith had a markedly decreased range of motion in the right shoulder, avoided movement of the right shoulder, had tenderness around the shoulder, and had moderate atrophy of his right biceps. *Id.*; Docket No. 13-1 at 4-5. Dr. Friederichs submitted a Request for Services ("RFS") for an MRI of the right shoulder, which Dr. Lim-Javate approved on April 25, 2014. Docket No. 1 at 5; Docket No. 17-2 at 5. The MRI was done on May 9, 2014. Docket No. 17-4 at 15.

On June 1, 2014, Dr. Friederichs submitted an RFS for an orthopedic consultation on a routine basis for a rotator-cuff tear because Smith's range of motion in his right shoulder had decreased. Docket No. 17-2 at 6.

**Decision # 1**: Dr. Lim-Javate, acting as chief physician and surgeon on June 4, 2014, denied the June 1, 2014 RFS. Dr. Lim-Javate explained her reasoning in her declaration:

> [T]he clinical management was incomplete and I had not been provided sufficient information about Mr. Smith's condition to justify processing the RFS. I exercised my medical judgment in denying this request for orthopedic consult based on several factors. My notes show that I wanted more information to explain Dr. Friederichs' finding of bicep atrophy, because the MRI report showed that the long head of the biceps tendon was intact and bicep atrophy may not be solely caused by a rotator cuff tear. Moreover, Mr. Smith's symptoms did not seem consistent with rotator cuff tear. In addition, other possible causes of Mr. Smith's complaints, such as impingement and frozen shoulder, had not been documented as ruled out. Before an orthopedic consult was ordered, I wanted to make sure that we had the correct diagnosis.

Docket No. 17-2 at 2-3. After denying this request, Dr. Lim-Javate had nothing further to do with

Smith's treatment. *Id.* at 3.

On August 19, 2014, Dr. Friederichs submitted another RFS requesting an orthopedic consultation on a routine basis for Smith's right shoulder pain. Docket No. 17-6 at 3. Dr. Friederichs wrote that Smith reported the pain was affecting his sleep and work duties in textiles; the x-rays were unremarkable; corticosteroid shots were no longer effective; Smith had limited abduction of the right shoulder to 70 degrees and elevation to 80 degrees; and Smith had passive range of motion of abduction to 160 degrees and elevation to 160 degrees. Dr. Bright denied this RFS on August 26, 2014. Docket No. 17-6 at 3. (Smith does not challenge this denial in this action.) Dr. Bright explained in his declaration that Dr. Friederichs' information suggested two possible diagnoses, there was no clear indication of what Dr. Friederichs wanted an orthopedic surgeon to do, and the choice of treatment depended on the loss of function the patient had. He further explained: "We do not put patients at risk of surgery if they are not going to improve their function." Docket No. 17-6 at 3. Also, frozen shoulders, such as that displayed by Smith, "typically resolve on their own and do not need surgery." *Id.*

Dr. Friederichs submitted a new RFS on September 18, 2014, for an orthopedic consultation on the basis that, contrary to information in his previous request, the patient did *not* have good passive range of motion and in fact was getting worse. Based on this new information, Dr. Bright approved the RFS for an orthopedic consultation on September 22, 2014.

Dr. Kowall, an outside orthopedic surgeon, examined Smith on October 22, 2014. *See* Docket No. 17-6 at 4. Dr. Kowall recommended neurological studies prior to considering surgery. Dr. Bright approved the requested neurological studies. *See id.* The studies were done in December 2014. The report for the studies concluded that the "electrophysiologic findings are consistent with moderate and chronic right suprascapular neuropathy. There is no evidence for C5 radiculopathy." Docket No. 22-1 at 4.

Dr. Kowall examined Smith again on February 18, 2015. His notes stated that Smith's "[c]ondition is multifactorial. Needs tertiary care evaluation for potential surgical remedy -- *if any*." Docket No. 22-1 at 2.

1    Dr. Friederichs had a follow-up appointment with Smith on February 20, 2015, and

2    reviewed Dr. Kowall's notes from February 18. Docket No. 22-1 at 13. Dr. Friederichs wrote that

3    Dr. Kowall had "reviewed the nerve conduction studies and did not feel that he could help the

4    patient with surgery to repair his rotator cuff tear. The patient was referred to a tertiary orthopedic

5    center." *Id.*[1]    Dr. Friederichs' plan was to obtain a further neurology consultation and an

6    orthopedic consultation at a tertiary care center. *Id.* Dr. Friederichs' notes state that he explained

7    to Smith that he would submit the paperwork but that it was difficult to get an appointment at a

8    tertiary care center; he also emphasized the need to continue the range of motion exercises. *Id.* at

9    14.

10    On February 28, 2015, Dr. Friederichs submitted an RFS for a "tertiary orthopedic

11    consult." Docket No. 17-7 at 20.

12    **Decision # 2**: Dr. Bright denied the February 28 RFS on March 6, 2015. *See* Docket No.

13    17-7 at 21 (progress notes). Dr. Bright explained his reasoning in his declaration:

14       [T]he procedure that Dr. Friederichs was seeking is a very rare procedure and most
         orthopedic surgeons do not do it. We knew that Mr. Smith had a suprascapular
15       nerve injury, but if it was due to trauma, surgery does not help and we would not
         want to risk surgical complications with no chance of improvement. So I needed to
16       know more information before I could approve the RFS. I communicated that need
         in the "Denied RFS" notes dated March 6, 2015.
17
     Docket No. 17-6 at 4.
18
     Dr. Friederichs then submitted an RFS for a surgical consult on March 17, 2015. *See id.*
19
20    **Decision # 3**: Dr. Bright denied the March 17 RFS on March 24, 2015. Dr. Bright

21    explained his reasoning in his declaration:

22       In my medical judgment, which I explained to Dr. Friederichs, there are two ways
         to entrap the supraspinatus nerve. Surgery could fix one of the possibilities, but the
23       other will not respond to surgery. With the information I had, I felt that the tear of
         the infraspinatus tendon was causing the nerve injury, and this was not amenable to
24       surgical repair. Therefore, a surgical consult was not necessary. I provided Dr.
         Friederichs with the medical literature that supported my opinion.
25
     Docket No. 17-6 at 4-5.
26

27       [1] The parties do not define "tertiary care" or "tertiary care center," but the context in which
28    the phrases are used indicates that the parties mean orthopedic surgery and orthopedic surgery
      center.

                                            4

Dr. Friederichs then submitted Smith's case to the Medical Authorization Review ("MAR") Committee, at which all the medical providers present at the prison gather to review cases. *See* Docket No. 17-6 at 5. The notes from the MAR Committee meeting show that someone presented the case for *not* performing surgery, and cited to information from the Wheeless Textbook of Orthopaedics about the management of suprascapular nerve entrapment, an article about non-operative treatment of suprascapular neuropathy, and information apparently from a website "infraspinatustear.com." Docket No. 22-1 at 20-21. Dr. Bright states that, during discussion of Smith's case, "Dr. Friederichs provided new, crucial information that only the supraspinatus muscle was atrophied and not the infraspinatus muscle. This changed the diagnosis to one in which the nerve entrapment could be released, so surgery could be approved. The MAR Committee therefore recommended that Dr. Friederichs re-submit his RFS for referral to a tertiary care center for a surgery consult." Docket No. 17-6 at 5. The notes from the MAR Committee meeting indicate that the vote was 7 to 2 in favor of authorizing a tertiary orthopedic consultation. Docket No. 22-1 at 17-18.

After the MAR recommended that Dr. Friederichs resubmit an RFS for referral to a tertiary care center, "Dr. Friederichs submitted that new RFS on April 30, 2015, and [Dr. Bright] approved" it. Docket No. 17-6 at 5.

On July 23, 2015, Smith was seen at San Joaquin General Hospital by an orthopedist, who recommended surgery. On July 30, 2015, Dr. Friederichs submitted an RFS for Smith to have surgery, and Dr. Bright approved that RFS on August 1, 2015. Docket No. 17-6 at 5.

Smith had shoulder surgery at San Joaquin General Hospital on August 14, 2015. Docket No. 17-6 at 5. The surgeon's notes state that, although the MRI had shown a retracted full-thickness tear of the infraspinatus and partial tear of the supraspinatus, the surgeon found that the infraspinatus was intact. Docket No. 17-7 at 28-29. The surgery performed was a decompression of the right suprascapular nerve and decompression of adhesive capsulitis (i.e., frozen shoulder). *See* Docket No. 17-7 at 30.

B.    Smith's Inmate Appeals

Smith filed two inmate appeals that reached the third level and addressed shoulder issues.

Smith's first inmate appeal was filed on July 27, 2014, and received inmate appeal log number CTF-HC-14040750. Docket No. 23-1 at 12-29. In this inmate appeal, he complained that he had been denied treatment by a specialist and denied an MRI for his shoulder, and requested referral to a specialist. Docket No. 23-1 at 15. According to Smith, this inmate appeal "does not involve Dr. Bright as his deliberate indifference was not manifested until months later when he denied the two RFS tertiary consults in March 2015." Docket No. 18 at 7. This inmate appeal (i.e., No. CTF-HC-14040750) was denied at the third level on February 5, 2015. Docket No. 23-1 at 13-14.

Smith's other inmate appeal received inmate appeal log number CTF-HC-15042345. *See* Docket No. 23-1 at 30-51. In this inmate appeal, Smith complained that he had not received copies of certain medical records, although he had requested them numerous times; his requested action is that he be provided the several medical records he requested. Docket No. 23-1 at 33. This inmate appeal (i.e., No. CTF-HC-15042345) was denied at the third level on December 3, 2015. *See* Docket No. 23-1 at 31-32.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to the complaint occurred in Monterey County, located in the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction over this action under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

## LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, as is the situation with defendants' challenge to the Eighth Amendment claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

When a defendant moves for summary judgment on an affirmative defense on which he bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). The failure to exhaust administrative remedies is an affirmative defense that must now be raised in a motion for summary judgment. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc). On a motion for summary judgment for no exhaustion, the defendant has the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Id.* at 1172. If defendant carries that burden, the "burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* The ultimate burden of proof remains with the defendant, however. *Id.* If material facts are disputed, summary judgment should be denied, and the "district judge rather than a jury should determine the facts" on the exhaustion question, *id.* at 1166, "in the same manner a judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue," *id.* at 1170-71.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Smith's complaint (Docket No. 1) was made under penalty of perjury and therefore will be considered as part of his opposition to the motion for summary judgment.

**DISCUSSION**

A.     Eighth Amendment Claim

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth Amendment claim on a condition of confinement, such as medical care, a prisoner-plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim.

To satisfy the objective prong, there must be a deprivation of a "serious" medical need. A serious medical need exists if the failure to treat an inmate's condition "could result in further significant injury" or the "'unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d

1091, 1096 (9th Cir. 2006). The evidence in the record suffices to allow a jury to conclude that Smith's shoulder problems presented a serious medical need.

For the subjective prong, there must be deliberate indifference. A defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (finding that a delay of seven months in providing medical care during which a medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*). There must be "harm caused by the indifference," although the harm does not need to be substantial. *See Jett*, 439 F.3d at 1096.

A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (summary judgment for defendants was properly granted because plaintiff's evidence that a doctor told him surgery was necessary to treat his recurring abscesses showed only a difference of opinion as to proper course of care where prison medical staff treated his recurring abscesses with medicines and hot packs). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058.

Prison officials cannot avoid Eighth Amendment liability by simply declaring that they disagree with a specialist's or treating doctor's prescribed course of care. The limits of the difference-of-opinion rule were illustrated in *Snow v. McDaniel*, 681 F.3d 978 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014), where the Ninth

9

Circuit determined that the district court erred in granting summary judgment for defendants who argued that their refusal to approve double hip-replacement surgery for a prisoner who could barely walk due to hip pain showed a mere difference of opinion. In *Snow*, the prison medical committee repeatedly refused to authorize a double hip-replacement surgery, even though an orthopedic surgeon and the prisoner's treating physician considered the requested surgery to be an emergency. *See id.* at 986. Not only had the medical committee refused to authorize the surgery, the committee "gave no medical reason for the denials" and some evidence suggested the refusal was due to the warden's dislike of death row prisoners such as the plaintiff. *Id.* at 986-87. *Snow* rejected the defendants' argument that their choice to treat the prisoner with medications rather than surgery showed merely a difference of opinion that did not amount to an Eighth Amendment violation. *Id.* at 987-88. Although there was "clearly a difference of medical opinion," the evidence in the record and inferences therefrom could allow a reasonable jury to "conclude that the decision of the non-treating, non-specialist physicians to repeatedly deny the recommendations for surgery was medically unacceptable under all of the circumstances." *Id.* at 988. Significantly, the defendants sent the prisoner for evaluation by orthopedic surgeons, both of whom recommended double hip-replacement surgery. *Id.* One of those surgeons testified at his deposition that the prisoner's likelihood of success after the surgery was very high, that surgery would help improve the prisoner's health and mobility, and that the surgery would allow the prisoner to avoid the use of the medications that were causing other health problems for the prisoner. On this record, "it should be for the jury to decide whether any option other than surgery was medically acceptable." *Id.* The court acknowledged that "a medication-only course of treatment may have been medically acceptable for a certain period of time," but saw the multi-year delay in approving the recommended surgery as presenting a triable issue as to medical acceptability of defendants' course of treatment under the circumstances. *Id.*

*Snow* did not hold that a triable issue is shown whenever prison officials fail to follow a doctor's recommended course of care. Indeed, *Snow*'s discussion shows that it was the unthinking denial-without-medical-reason behavior of prison officials that could allow a jury to conclude that the prison officials had acted with deliberate indifference to that inmate's medical need. The

Ninth Circuit distinguished Snow's situation from that in *Toguchi*, where the plaintiff challenged the defendant-doctor's choice to discontinue a particular medication but did not present expert testimony showing that the discontinuation of the medication was medically unacceptable, and the defendant-doctor had submitted expert testimony that her actions met the standard of care. *See Snow*, 681 F.3d at 988-89 (citing *Toguchi*, 391 F.3d at 1055-56). The Ninth Circuit also distinguished *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989), on the basis that "only one prison doctor told the inmate that surgery would be necessary" in *Sanchez*, whereas "the consistent recommendation by two outside specialists over the course of three years" in *Snow* was that the prisoner needed double hip-replacement surgery to alleviate his severe pain and mobility issues. *Snow*, 681 F.3d at 989.

### 1. Dr. Lim-Javate (Decision # 1)

Having carefully reviewed the evidence, the court concludes that no reasonable jury could find that Dr. Lim-Javate acted with deliberate indifference to Smith's medical needs in denying the June 1, 2014 RFS for an orthopedic consultation. The evidence shows that, about a month after the MRI she had approved was done, she denied the RFS for Smith to see an orthopedist. Dr. Lim-Javate's notes made contemporaneous with the denial of the RFS (*see* Docket No. 17-2 at 6 (bottom half of page)) and her declaration explain the medical basis for her denial of the request that Smith be sent to an orthopedist for a consultation. It is undisputed that Dr. Lim-Javate denied the RFS for an orthopedic consultation because the clinical management was incomplete and she had not been provided sufficient information to justify sending Smith for an orthopedic consultation. She wanted more information about Dr. Friederichs' diagnosis of a rotator cuff tear. Specifically, Dr. Lim-Javate: (1) wanted to learn more about Dr. Friederichs' finding of biceps atrophy, given the MRI findings and the fact that such an atrophy is not solely caused by a rotator cuff tear; (2) did not think Smith's symptoms seemed consistent with a rotator cuff tear; and (3) thought there were other possible causes for Smith's complaints, such as impingement and frozen shoulder, which had not been documented as having been ruled out by Dr. Friederichs. Perhaps an orthopedist could have provided the information Dr. Lim-Javate sought, but there is no evidence

that *only* an orthopedist could provide the information such that it would have been medically unacceptable to deny the referral before that information was provided by the treating physician. Smith provides no competent evidence to show a triable issue as to the medical acceptability of her decision-making.

Smith argues that Dr. Lim-Javate's denial of the RFS was medically unacceptable because, in his view, she "had no legitimate medical reason to request that Dr. Friederichs seek whether Plaintiff had an impingement/frozen shoulder." Docket No. 18 at 12. Smith tries to show the medical unacceptability of Dr. Lim-Javate's decision by relying on information he purportedly read in articles he found on various internet sites. For example, he urges that "there are four common signs that identify a rotator cuff tear," according to the website www.verywell.com, and he had all four signs. Docket No. 18 at 10. As another example, he discusses information he learned about rotator cuff tears and frozen shoulders from other websites, including www.webmd.com, www.orthoinfo.aaos.org, www.mayoclinic.org, and https://en.m.wikipedia.org. *Id.* at 11-12. However, defendants object to evidence derived from internet articles as inadmissible hearsay. That objection is sustained, and the court will not consider the statements that allegedly came from articles on internet sites.[2]

---

[2]"[I]t is well established that medical textbooks, treatises and professional articles are not freely admissible in evidence to prove the substantive or testimonial facts stated therein, since they are subject to the hearsay rule." *Hickock v. G.D. Searle & Co.*, 496 F.2d 444, 446 (10th Cir. 1974). A statement from a medical textbook, treatise or professional article may be admissible if the statement is established to be from a reliable medical authority and is relied upon an expert witness. *See* Fed. R. Evid. 803(18); *Tart v. McGann*, 697 F.2d 75, 78 (2d Cir. 1982). Even assuming arguendo that one or more of the websites mentioned by Smith could be shown to be a reliable medical authority, the hearsay exception in Rule 803(18) does not apply because Smith has not shown that he has any medical expertise and has not presented any expert witness who relied upon any of the articles. Thus, in evaluating defendants' motion for summary judgment, the court will not consider those statements that allegedly came from medical-condition articles found on internet sites. *See generally Combs v. Washington*, 660 F. App'x 515, 518 (9th Cir. 2016) ("district court did not abuse its discretion when it excluded as hearsay several Internet articles about [plaintiff's] medical conditions" and denied plaintiff's motion to appoint independent medical and dietary experts); *Nguyen v. Biter*, 2015 WL 5232163, at *9 (E.D. Cal. 2015) (excluding, on hearsay grounds, *pro se* plaintiff's "written information on arsenic, apparently obtained from the internet and perhaps a book"); *Taylor v. Patel*, 2017 WL 3315319, *2 (E.D. Cal. 2017) (sustaining objection to *pro se* plaintiff's printout from internet site discussing the different purposes of an x-ray and an MRI).

United States District Court
Northern District of California

Smith next argues that Dr. Lim-Javate's deliberate indifference is shown by the fact that she denied the request for services without having first physically examined him. The fact that the chief medical officer denied the RFS without examining the patient might reflect a bureaucracy or the realities of managed care. But it does not support an inference of deliberate indifference under the circumstances present here. The RFS included the treating doctor's reasons for requesting the authorization, and her denial was accompanied by questions for that treating doctor. When that doctor provided additional information in a follow-up RFS, the request for an orthopedic consultation was approved (albeit by Dr. Bright, who also had not physically examined Smith). Indeed, the RFS and the response appear to be akin to a dismissal without prejudice -- i.e., that the reviewer has determined that the information presented did not support approval of the request, but allowing that additional or different information might lead to a different decision.

Smith further argues that the medical unacceptability of Dr. Lim-Javate's decision is shown by the fact that she asked about a frozen shoulder when the MRI showed tears on two muscles. *See* Docket No. 18 at 13, 14. But he presents no competent evidence that the conditions (frozen shoulder and a tear on the infraspinatus or supraspinatus muscles) are mutually exclusive. Nor does he controvert defendants' evidence that frozen shoulders "typically resolve on their own and do not need surgery." Docket No. 17-6 at 3. And he presents no competent evidence that it was medically unacceptable for Dr. Lim-Javate to want to learn more about the biceps atrophy finding before she would approve an orthopedic consultation. Ultimately, Smith does nothing more than show a difference of opinion as to whether Dr. Lim-Javate should have approved an orthopedic consultation based on the information that was provided to her. But a difference of opinion about which medically acceptable course of treatment should be followed does not amount to deliberate indifference. *See Sanchez*, 891 F.2d at 242. Unlike the situation in *Snow v. McDaniel,* 681 F.3d 978, discussed earlier in this order, Dr. Lim-Javate articulated specific reasons for her decision at the time she made that decision. The record simply does not show the sort of unthinking denial-without-medical-reason approach that presented a triable issue in *Snow*.

2. <u>Dr. Bright (Decision # 2 and Decision # 3)</u>

Having carefully reviewed the evidence, the court concludes that no reasonable jury could find that Dr. Bright acted with deliberate indifference to Smith's medical needs in denying the February 28, 2015 and March 17, 2015 RFSs for a surgical consultation at a tertiary care center. The evidence is undisputed that, before these RFSs were submitted, an MRI had been done, some nerve conduction studies had been done, and Smith had already had a consultation with one orthopedist -- a consultation that Dr. Bright had authorized. The undisputed evidence shows that, in denying the February 28 RFS, Dr. Bright believed that surgery would not help if the suprascapular nerve injury was due to trauma, did not want to risk surgical complications with no chance of improvement, and wanted more information before he could approve the RFS. It also is undisputed that, in denying the next RFS dated March 17, Dr. Bright (1) believed that a supraspinatus nerve could be entrapped in two different ways, and surgery could fix only one sort of supraspinatus nerve entrapment; (2) determined, based on the information provided to him, that a tear of the infraspinatus tendon was causing the nerve injury and the injury thus was not amenable to surgical repair; and (3) believed a surgical consultation was not necessary because the injury was not amenable to surgical repair. It is undisputed that Dr. Bright provided Dr. Friederichs with the medical literature that supported his medical opinion.

Smith argues that the medical unacceptability of Dr. Bright's denials of these two RFSs is shown by the fact that the MAR committee approved a surgical consultation about a month later -- apparently trying to show deliberate indifference based on the opposing conclusions. Smith disagrees with defendants' argument that there was new information provided at the MAR Committee meeting that had not been presented to Dr. Bright in the earlier RFSs. Smith argues that Dr. Bright fails to prove that Dr. Friederichs presented any new evidence to the MAR Committee beyond that presented to Dr. Bright when he denied the two RFSs. *See* Docket No. 18 at 17-18. Smith is wrong on the facts. Dr. Bright's declaration provides the proof, as Dr. Bright declares that, at the MAR Committee meeting attended by both Dr. Bright and Dr. Friederichs, Dr. Friederichs presented the new information that only the supraspinatus muscle was atrophied, which meant that a surgical solution for the problem did exist. *See* Docket No. 17-6 at 5 (Bright

14

Declaration); *see also* Docket No. 22-1 at 17 (MAR Committee minutes showing both Dr. Friederichs and Dr. Bright were present). Smith fails to present evidence to show that the MAR Committee in April considered the exact same information as that considered by Dr. Bright when he denied the two RFSs several weeks earlier. But even if Smith could find such evidence, it would not necessarily defeat the summary judgment motion: Smith would need to show that Dr. Bright's decision on the two RFSs was medically unacceptable, not just that Dr. Bright had a difference of opinion with other doctors as to the proper course of care for the shoulder.

Smith also suggests that Dr. Bright voted against the surgical consultation at the MAR Committee meeting. Docket No. 25 at 6. But the record does not demonstrate that to be true. The MAR Committee voted in favor of the surgical consultation in a 7 to 2 vote, but the minutes do not show whether Dr. Bright voted in favor of or against the consultation. *See* Docket No. 22-1 at 17, 18. Dr. Bright's declaration also does not state how he voted at the MAR Committee. Rather, Dr. Bright states merely that, after the MAR Committee approved the surgical consultation on April 17, he approved the RFS submitted a couple of weeks later. *See* Docket No. 17-6 at 5.[3] Any dispute as to whether Dr. Bright voted in favor of or against the consultation at the MAR Committee meeting is not a material dispute, however, because Dr. Bright approved the RFS submitted after the MAR Committee approved the surgical consultation, regardless of how he voted at the meeting.[4] Smith has failed to provide evidence sufficient to allow a reasonable jury to find in his favor on his Eighth Amendment claim.

Smith fails to present evidence that would allow a reasonable jury to find that either defendant was deliberately indifferent to his shoulder care needs. Unlike the situation in *Snow*,

_____

[3] The parties do not explain how the MAR Committee decision-making worked. The wording of the MAR Committee meeting minutes suggests that the MAR Committee could recommend that an RFS be approved but could not itself approve an RFS. *See* Docket No. 22-1 at 18 ("Committee Recommendations: . . . You can't change the denial to an approval, after-the-fact. Either, you have to submit a new one or move this forward.")

[4] Smith also argues that Dr. Lim-Javate voted against a surgical consultation at the MAR Committee meeting. As with Dr. Bright, the record does not show how Dr. Lim-Javate voted. In any event, Smith does not allege any claim in his complaint about Dr. Lim-Javate's voting at the MAR Committee meeting. Amendment to add such a claim would be futile because Dr. Lim-Javate's vote resulted in no harm to Smith because the RFS was approved following the recommendation of the MAR Committee, regardless of how Dr. Lim-Javate voted.

and like the situation in *Toguchi*, defendants present medical reasons for their choices to deny the RFSs for Smith. And, as in *Toguchi*, Smith does not present expert evidence to show that defendants' decisions were medically unacceptable and made in conscious disregard of an excessive risk to his health. When the evidence is viewed in the light most favorable to Smith, and inferences therefrom drawn in his favor, no reasonable jury could return a verdict for him and against Dr. Lim-Javate or Dr. Bright on Smith's Eighth Amendment claim. Dr. Lim-Javate and Dr. Bright therefore are entitled to judgment as a matter of law on the Eighth Amendment claim.

B.      Exhaustion of Administrative Remedies

        1.      The Exhaustion Requirement For Prisoners

        "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016) (mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). All available remedies must be exhausted; those remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Porter,* 534 U.S. at 524. Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit. *Id.*; *Booth v. Churner*, 532 U.S. 731, 741 (2001). Section 1997e(a) requires "proper exhaustion" of available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Proper exhaustion requires using all steps of an administrative process and complying with "deadlines and other critical procedural rules." *Id.* at 90.

        The State of California provides its inmates and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a). In order to exhaust available administrative remedies within this system, a prisoner must proceed through three formal levels of

16

appeal and receive a decision from the Secretary of the California Department of Corrections and Rehabilitation or his designee. *Id.* § 3084.1(b), § 3084.7(d)(3). Inmate appeals regarding health care matters are processed slightly differently from non-health-care appeals, although they also must proceed through the three formal levels. First- and second-level health care appeals are processed by staff located at each prison. *See* Docket No. 23 at 2. When the inmate pursues the health care appeal to the third level, the appeal is processed by the staff in the Health Care Correspondence and Appeals Branch (HCCAB) (formerly the Inmate Correspondence and Appeals Branch) at the California Correctional Health Care Services (CCHCS) headquarters. Docket No. 23 at 1-2. "[T]he HCCAB receives, reviews, and maintains all health care appeals accepted for the third and final level of review in the inmate health care appeal process, and renders decisions on these health care appeals." *Id.* at 2.

### 2.  Analysis

Dr. Bright has moved for summary judgment on the ground that Smith did not properly exhaust administrative remedies for his claim against Dr. Bright because he did not file any inmate appeal that received a decision from the third, or highest, level in the inmate appeals system about Dr. Bright's conduct giving rise to the claim in the complaint.[5]

The parties agree that Smith filed only two inmate appeals about issues potentially related to his shoulder. One of the appeals (i.e., CTF HC 15042345) did not pertain to anyone's decisions regarding treatment, and instead requested medical records. *See* Docket No. 23-1 at 33. The other inmate appeal (i.e., CTF HC 14040750) pertained to the refusal to send him for an orthopedic consultation, but that appeal (1) did not mention Dr. Bright; (2) was followed by an initial orthopedic consultation that took place on October 22, 2014; and (3) was filed months before Dr. Bright denied the February 28 and March 17 RFSs that form the basis for Smith's Eighth Amendment claim.

---

[5] Smith argues that he exhausted administrative remedies for his claims against both Dr. Lim-Javate and Dr. Bright. The court considers only whether he exhausted his claim against Dr. Bright because defendants do not argue nonexhaustion as to the claim against Dr. Lim-Javate.

Dr. Bright has carried his burden to demonstrate that there were available administrative remedies for Smith and that Smith did not properly exhaust those available remedies. The undisputed evidence shows that California provides an administrative remedies system for California prisoners to complain about their conditions of confinement, and that the only inmate appeal filed pertaining to the denial of treatment and services for his right shoulder that received a decision at the third level did not assert any wrongdoing by Dr. Bright and did not mention him by name or title, even though Smith was required to do so by the regulation in order to properly exhaust administrative remedies. Cal. Code Regs. tit. 15, § 3084.2(a)(3). Smith did not properly exhaust his administrative remedies against Dr. Bright. *See Ngo*, 548 U.S. at 90-91 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.").

Once Dr. Bright met his initial burden, the burden shifted to Smith to come forward with evidence showing that something in his particular case made the existing administrative remedies effectively unavailable to him. *See Albino*, 747 F.3d at 1172. Smith does not dispute that he did not receive a third-level decision on any administrative appeal concerning Dr. Bright, and instead contends that use of the three-level inmate-appeal system was unnecessary because his case went to the MAR Committee.

Smith argues that, although he did not file a CDCR-602 medical appeal, he exhausted by "appeal[ing] Dr. Bright's denials to the Medical Authorization Review ('MAR') Committee." Docket No. 18 at 9. He presents no evidence that he submitted anything to the MAR Committee or that the MAR Committee was convened for purposes of resolving inmate grievances. The only evidence in the record indicates that the MAR Committee convened to make a medical recommendation in response to a request for services from a doctor. Smith contends that a "full hearing was held" by the MAR Committee on Dr. Bright's denial of the two RFSs. *Id.* In Smith's view, "because Dr. Bright was afforded a 'full opportunity' to correct his actions the exhaustion requirement of the PLRA has been satisfied." *Id.* Smith's argument is unpersuasive. The fact that the MAR Committee considered his medical condition and decided to recommend a surgical

referral does not suggest that any prison official "ignore[d] the procedural problem" of Smith not filing an inmate appeal against Dr. Bright. Prison officials did not choose to ignore a problem of which they were not made aware. *Cf. Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016) (exhaustion occurred where "prison officials ignore[d] the procedural problem and render[ed] a decision on the merits of the grievance" about pain management that failed to identify two prison doctors).

Bearing in mind that a defendant has the ultimate burden of proof on the defense and viewing the evidence in the light most favorable to Smith, the court concludes that Dr. Bright is entitled to judgment as a matter of law on the affirmative defense that Smith failed to exhaust administrative remedies for his Eighth Amendment claim against Dr. Bright. Normally, an exhaustion problem would require dismissal without prejudice. Here, however, because the claim against Dr. Bright also fails on the merits, the appropriate outcome is to enter judgment in favor of Dr. Bright, rather than merely staying the action while Smith exhausts administrative remedies or dismissing the claim without prejudice to Smith refiling it after he exhausts administrative remedies. *Cf. Lira v. Herrera*, 427 F.3d 1164, 1175 (9th Cir. 2005) (when complaint contains exhausted and unexhausted claims and prisoner wishes to proceed with only the exhausted claims, the district court should simply dismiss the unexhausted claims when the unexhausted claims are not intertwined with the properly exhausted claims).

## CONCLUSION

Defendants' motion for summary judgment is GRANTED. (Docket No. 17.) Defendants are entitled to judgment as a matter of law on plaintiff's claims. The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: November 8, 2017

_____
SUSAN ILLSTON
United States District Judge